We have three argued cases before the court today, but before we get to that we have one of the more pleasant opportunities that this court gets to go through, which is that I understand that Judge Reyna has a motion that he would like to make to the court. Yes, I move for the admission of Clinton R. South to be a member of our distinguished court. You know, Clint, they say that time flies when you're having fun, but here at the Federal Circuit we say time flies when you're working hard. And time sure must have flown fast for you this past year as you've served as my clerk. Your work ethic is exemplified by your excellent work product. And I know that before me stands an attorney who will be an excellent practitioner and member of our bar. Thank you so much for your work, my chambers, and everything you've done for our court. Thank you, Judge. We now need to take this under advisement. I completely agree. Clint, I'm also familiar with all the great things that you have done for the court and how well you have worked with my clerks over the years. So I think that Judge Chen and I have unanimously agreed that you should be admitted to the bar. Would you write it in? Do you solemnly swear or affirm that you will comport yourself as an attorney and counselor of this court, uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Welcome to the bar of the United States Court of Appeals for the Federal Circuit. Thank you. Okay, the first case before the court, Mark David v. United States, 15-1276, an appeal from a decision of the Court of International Trade. Mr. Schaffer, do you want to save five minutes for rebuttal? At least I'm hopeful I'm going to be brief in my affirmative argument hereon. Okay. Thank you all, and may it please the court. My name is Alex Schaffer of the law firm of Kroll & Mooring here on behalf of the Mark David Division of Baker, Knapp & Tubbs. With the court's indulgence, I think I'm going to dispense with a lot of the usual throat clearing and background and just get to what I think is the 800-pound gorilla in the room. We have a case about the corroboration or lack thereof of a PRC-wide raid. And if I were sitting where you are sitting, which I appreciate is not an exceptionally likely turn of events, but if I were, I think I would ask, listen, Schaffer, is there anything left of your case in light of our decision in the shrimp case just days ago? And the point that I want to make is that I think I feel quite strongly that the answer to that is yes, and I'd like to share why I think that. In that case, here's how the court characterized what the Commerce Department did. The court said, Commerce found that by quantity, the condoms accounting for a significant volume of merchandise under consideration were sold at prices that resulted in margins which exceed the 112% margin that was at issue in that case. A little bit later on, the court said, Commerce reasonably relied on the significant volume of sales by the largest cooperating exporter in the review that they were using as corroboration for the margin that they calculated. And the point that I want to make is what a stark contrast to the facts that we have on the record in this case, where there's nothing in the way of quantification of the sales that they used from this 2009 review to corroborate the rate that was ultimately applied. What they say is they've got a rate that they calculated for a new shipper 10 years ago. And then in the 2009 review, they say, well, there was an exporter, and we look at their sales database, and that 216 is – the phrase that they use is within the range of margins. In other words, there's some sale or sales somewhere in there that were as high as 216%. Now, I would note that exporter got a margin of 42% in that review. So there could have been a lot of sales in the neighborhood of 216%. So I submit that mathematically it's exceedingly unlikely that there was a significant quantity of sales on a condom-by-condom basis at those levels. But the fact is we don't know. I'm having a problem with your whole proposition that there has to be the kind of corroboration you're talking about where what we're dealing with here is a PRC-wide entity rate. I mean the case law that you cite, even peer-bearing, seems to stand for the opposite proposition that you cited for it. I mean it specifically says that when you're talking about a PRC-wide entity rate that there is no need to individually corroborate that rate. Well, I don't know if there's need to individually corroborate the rate, but there still needs to be something to support. And it seems to me when you have a situation whereas here, the rate that they're coming up with is five times what the worst margins are for cooperating respondents. Now, I understand the court has said over and over again, look, we're not going to treat non-cooperating respondents the way we would if they were cooperating. Fair enough. But the cooperating respondents who are getting the roughest margins are getting margins on the order of 42%. And so if it's going to be Congress's position that all of those respondents are selling at somewhere between 20% and 42%, everybody else is selling at 200-plus, 216%. It would seem to me there has to be some corroborative basis for that. I mean when you treble the worst margins that people are getting, you're still not even close to the number that they're applying here. And what they've offered as support for the proposition that this is what the PRC-wide entity is up to in the background is some presumably insignificant volume of sales from a sales database that's already four years old. Counselor, are you arguing that the information relied on by Commerce is inaccurate or flawed or that it's simply just not sufficient? That's imperfect. Well, I'm not sure what Your Honor means by inaccurate. I would accept, not being on the APO of that 2009 review, I have no way to validate what they found in that sales database. But I would accept for these purposes that that number probably appears somewhere in there. But the question is how meaningful is that? It couldn't possibly have been a significant number of sales. It's for one exporter who, again, got a 42% margin. To link that and say based on the presence of that outlier sale in that database, we can presume that that's what the PRC-wide entity is doing just seems to me a bridge too far. So to answer your question, I would say it's insufficient. Isn't that what Ed Hochstrom says, that it is presumed absent some rebuttal? And the rebuttal evidence that you're giving us is that certain cooperating entities got different individual rates. But that doesn't have anything to do with the PRC-wide entity rate.  I think it does have something to do with it. Not in the sense that those rates should be a proxy for what the PRC-wide rate ought to be. But with a delta like this, there has to be some explanation for the divide. It cannot be that they calculate 216% in 2004 or whenever it was that they cook it up. And then use it in perpetuity with the support being, well, a sale in a database for an exporter is enough. There's no burden. I don't think even Ed Hochstrom goes that far. There's no burden on commerce to prove that. All commerce has to say is that we have this rate that was established from real numbers from a cooperating entity. And that that rate remains presumptively the PRC-wide rate absent rebuttal evidence. And because there's been no cooperation and no evidence as to why that rate no longer would be good, I don't know where you can take us. Well, I don't think that is all that they're required to do, Your Honor. I guess that's where I differ. I think, first of all, when you say that rate, again, not to bang away at this, but that wasn't a rate for anybody. That was a margin on some small number of sales. And I think that's important. But more to the point, I don't think even Ed Hochstrom says that is presumptively anything. It says at base that there still has to be some level of corroboration. Now, in Ed Hochstrom, they had some meaningful quantum of sales. And they said we can reasonably infer that the fact that this is a major exporter and the fact that this is a significant amount of sales, and, in fact, there are margins well above this rate within that significant number of sales, that's a fair proxy for what the PRC wide entity is doing. We don't have anything like that here. So is it part of your problem that they went back too far, that instead of going back to 2004, maybe Commerce should have used data from 2008 and other reviews? Well, I think there were a lot of things that they could have done. My impression, to me, I think what they ought to do, what they always ought to do, is start with some commercially reasonable rate that's supported by something and then add some incentive there. Well, they went back, and they went back to the 2005 New Shipper Review, and then they used verified sales. These are verified sales from that particular review period because there were no cooperating respondents after that. Wouldn't substantial evidence support that reasoning by Commerce? Again, I don't think so. I think that there's got to be a little more of a showing when you have this sort of a delta, and given this passage of time. And I'm aware of the precedent that suggests that the length of time by itself isn't as positive. But I'd say the time coupled with the results on the record that we're seeing. There's nothing innately wrong with going back four and five and seven and ten years to look at a rate, particularly where you have a couple of review periods without cooperating respondents. How would you characterize Ad Hoc Shrimp? What effect has that decision had on your blue brief? Well, frankly, what I think it – in some ways, it's not super helpful. But what I think it does is if nothing else, there was some math done, right? Elementary school principals, there was some work shown in Ad Hoc Shrimp. There was some quantitative analysis that said here's what's going on with these sales and here's why we're doing it. In this case, they had a rate that they liked, and they went hunting around for some basis to support it. And the gruel is very, very thin. But did you ever argue below that the original rate was calculated based on too low of a sales? I mean, as I read your briefs, and, you know, they're a little bit troubling because you cite cases for propositions they don't really stand for. But you simply made the argument that they had to make an individualized rate corroboration as it related to your company, your client. So I don't see you ever questioning the original determination that that was a PRC-wide entity rate. Which original determination, Your Honor? Because we certainly did. The original number that they chose. Well, you mean for the – from the 2004 review? Yes. Well, I'm not sure how we could challenge that without having been on the record of that review. But, I mean, now you're telling us that we should go back and say, because of ad hoc shrimp, that it wasn't based on enough sales. Well, again, that's the 2009 review. And they cited that decision memo and included it on the record of this. And, yeah, that is what I'm arguing. They said the 2004 review gave us the number. That's not what they used as corroboration. They said the 2009 review is the corroborative review. And that's the one where the decision memo says it's within the range of margins. And it doesn't say anything more than that. I don't understand what the principle of law is you want us to adopt. Dong Thai peak honey combined with ad hoc shrimp, to me, completely foreclosed your case. So what is the wiggle room left that is still open for you to ask for some, I don't know, recalibration of those opinions? What is the rule of law you want us to apply? You think Congress should have done some kind of extra corroboration, but you didn't qualify for a separate rate. So I don't understand what is the rule of law you want us to apply. What is the rule of law you want us to adopt? That the PRC-wide rate, whether applied in the context of adverse facts available or just applied qua the PRC-wide rate, needs to be corroborated meaningfully. And it's our position that that wasn't done here. Both Dong Thai peak honey and ad hoc shrimp say that. Dong Thai peak says, look, you, respondent, are trying to get us to use your data. But if you didn't cooperate, you can't do that. But if that country-wide rate is based on verified data and then also on a shipper review and this is a cooperating respondent, why isn't that sufficient corroboration? Because verified data, the overall… Verified sales data. Because a given sale can be an outlier. The fact that if you get a de minimis margin, notwithstanding that you have one sale in your sale database, the rate on the margin on which was 200%, there's no way the 200% is representative of even what you're doing. But the sale is verified. And one sale can set a dumping margin, right? It can, but it didn't for that exporter. I mean, this is the leap that gives us so much trouble. That sale or whatever quantum of sales that it was wasn't even representative of what that company was doing. And so I'm baffled how it can be representative of what the PRCO identity is doing. Tell us what you think meaningful corroboration would look like. Well, I mean, for example, one way to do it would be to say, look… I'm just sort of going off the cuff. But one way to do it would be to say the worst margin that anybody's gotten in the last five reviews is 43%. We're doubling that to provide incentive for people to cooperate. That's worse than anybody – far worse than anybody has done. It's tied to a rational number, meaning the margins that actual companies are getting in ongoing reviews. And it has a built-in incentive to… But there's no commercial reality in your example. You just want us to pull a number out of the air and double it. Or not out of the air. You want us to get a number, in this case, based on – and then just simply double it. Well, but that's exactly what the precedent suggests. The precedent suggests that you start with some sort of commercially reasonable verifiable number, and then you add in an incentive to incentivize cooperation. Isn't that what happened here? I mean, they started with a verified number, sales data. Actually, there was no multiplication after that. That sale reflects commercial reality. Again, I take issue with that, Your Honor. I don't see that it does. I don't see how a sale of some margin in the neighborhood of 216% reflects commercial reality when even the seller had an actual overall margin of 42%. I don't know whose commercial reality that represents. Okay. I'll give you two minutes for rebuttal. Thank you, Your Honor. May it please the court. Obviously, we have one area to focus on, right? They've narrowed their argument. They've focused on one thing. So let's just focus on the corroboration. Indeed. The court should affirm because commerce corroborated the China-wide AFA rate using the most current verified data available. The statute supplies the standard. It's not meaningful corroboration, which suggests a subjective inquiry. The statute, 1677E sub c, requires corroboration by commerce to the extent practicable. Well, it at least means economic reality, right? It means to the extent practicable, which has to do with using the information that is reasonably available to commerce at the time. And here, there was no cooperating respondent in either the 2011 review or the 2010 review. So commerce looked back to the most recent reviews in which there was cooperative respondent data verified on the record that was in 2008 and 2009. And commerce found, and this is set forth in the 2009 preliminary results and the 2008 final results that are cited in our brief, that commerce relied upon a substantial number of sales and a substantial percentage of sales from cooperating respondents in the same industry as Meoji to corroborate the 216 rate. Specifically, to respond to the argument that was presented to you, commerce relied upon a large number of transactions that were above 216. In looking at the transaction-specific margins from those cooperating respondents in those two reviews. And in addition, commerce relied upon a substantial percentage of sales. So we have the exact same circumstances that, Judge Reyna, were present in your decision in Ad Hoc Shrimp. A substantial number of transactions, a substantial percentage of sales from cooperating respondents in the same industry as the part of the respondent. Just a correction. The Ad Hoc Shrimp case was not my decision. It was a court decision. It was a decision of the entire court. Okay. Indeed, Your Honor. Show me where in the record it says that commerce relied on substantial numbers of sales above the 216%. Your Honor, that is in the federal register notices from the 2009 review and the 2008 reviews. I don't believe those are in the joint appendix, but we'd be happy to provide those if they're readily available. Also, if the court- Because you don't say that in your brief. We cite the 2009 figure. But you disagree that there was a single sale and that single sale was an outlier sale? Absolutely, Your Honor. If the court wishes us to provide the specifics, those are confidential, but we'd be happy to file those under seal. But what we do have is- It's not anything like you just said. What you said is that you relied on a large number of transaction-specific margins, and you found that the transaction-specific dumping margins relied upon were not unusually high or otherwise inappropriate. That's all you said. Your Honor, I would refer Your Honor to pages 23 to 24 of our brief. That's where I am. At the very last sentence on 23 during the 2009 review, commerce relied upon a large number of transaction-specific margins. Yeah, but you don't ever say that substantial numbers of those were above the 216%, and I never understood that from your briefs. Your Honor, we also have the, we're citing on page 24 to the 2009 preliminary results, which disclosed that the transaction-specific dumping margins used to corroborate the AFA rate were sufficient in number, both in terms of the number of sales and as a percentage of total sales quantity. And Your Honor, if the court wishes to have the specific numbers, if you order us to provide it, we'd be happy to give you those numbers. I'm very comfortable in saying that they were a large number of transactions and a substantial volume of sales. I guess I'm just confused why this is such a critical part of your argument, because it seems to be, as it relates to corroboration, you wouldn't have provided that information to us in the first instance. Your Honor, that issue was not squarely litigated in the trial court, and we did not anticipate that being the focal point here today. But again, Your Honor, we're— Well, Mark David in the blue brief comes on pretty strong that what commerce did is that they cherry-picked a number and relied on a single transaction. I mean, you reading that, shouldn't—have you argued, no, there was significant sales or substantial sales? We did, Your Honor, on 23 and 24 of our briefs. You just say it. You don't give us any support for it. Well, it wasn't in the trial court record, and so we are somewhat conservative in putting together the appendix. But in response to a factual assertion, I'm telling you what the facts are. Your argument here is that the Federal Register notice with respect to those particular reviews will alert us to the fact that substantial sales were reviewed. That's correct, Your Honor, both in terms of the sheer number of transactions as well as the percentage of sales. But we kind of like to see the underlying data in these type of cases, especially when these type of issues are involved. I understand, Your Honor. We'd be happy to supplement the appendix if the court wishes us to do so. We'll let you know if we think that's appropriate. Here, commerce found that the China-wide AFA rate was relevant because it was based on a previously calculated rate for a cooperative respondent named Kun Yu, which was operating in the same industry as Miyoji, and commerce found that the China-wide AFA rate was reliable for three reasons. It was based on verified sales and cost data from the 2005 new shipper review. Secondly, it was corroborated using verified data from cooperating respondents in the 2008 and 2009 reviews, and there was no current record evidence. None put on the record by Mark David that called the continued viability of that rate into question. This case, Judge Chen, as you observed, Dong Tai Pecani and Ad Hoc Shrimp do completely foreclose Mark David's case here. In those two cases, which are strikingly similar to this one, the court sustained commerce's selection of a China-wide AFA rate based on a previously calculated rate when there was no current record evidence that indicated the rate lacked probative value. The only thing that Mark David points to as suggesting that there's a lack of probative value in the AFA rate is cooperative respondent rates, but those are apples and oranges. Those cooperative respondents have separate rate status. They are not even part of the China-wide entity. And in Ad Hoc Shrimp, the court held that the rates calculated for separate rate respondents have, quote, little bearing, unquote, on the China-wide AFA rate. And indeed, this court has long recognized that AFA rates are typically higher than those rates for cooperators. Because commerce corroborated the China-wide AFA rate to the extent practical based upon the most current verified data available, the court should affirm. Thank you. What if there hadn't been any attempt to corroborate or verify during the 2008-2009 periods of review? Would this case come out differently in your view? To the best of my recollection, I would say no, Your Honor, because, again, it's to the extent practicable. Commerce needs to corroborate. I believe in Dong Tai Peak Honey, there was no transaction-specific margin data available. And nonetheless, the court sustained based upon the reliance on a previously calculated rate for a respondent in the same industry. So if the information is there to use, the cooperative respondent data is there to use to corroborate, commerce would prefer to be able to do that analysis. But it's not always, as a practical matter, going to be available. And so commerce necessarily must rely upon what is available in a particular case. Okay, thank you. Thank you. Good morning, Your Honors. May it please the court, my name is Lee Smith. I am with King & Spalding, and I represent the American Furniture Manufacturers Committee for Legal Trade. Can you speak up a little bit, sir? Yes, ma'am. I would just like to clarify one point, that the 216% rate was for 2005 cooperating verified respondent without any adverse inferences. And that rate was corroborated in 2008 and 2009 reviews. The corroboration looks at transaction-specific rates at or above the 216% rate. That's commonly commerce's corroboration methodology. Moreover, commerce does not need to look at a substantial number of sales to corroborate a rate, as this court has held. Well, the government just argued there were a substantial number of sales. There were, that is correct, but that is above and beyond what we believe is necessary. Okay, but in this case, those substantial number of sales did not reflect anything above the 216 rate. In other words, not a substantial number above the 216 rate. In the 2008 review, just to quote the Federal Register notice, commerce found that there were – the commercial reality that the rates used to corroborate were sufficient in number in both terms – sufficient in number both in terms of number of sales and percentage of total quantity that were at the 216% rate. In 2009, commerce, to quote the Federal Register, found that the 216 – the data used to corroborate the 216 rate, those data are, quote, based on real transactions that occurred during the POR and subject to verification by the department. So more – it was numerous transactions in both 2008 and 2009 to corroborate this 216% rate that was calculated in 2005. And the 216 rate, the transactions, those were not with cooperating entities. They were not with cooperating entities. They were – that was based on a cooperating entity that was verified. In 2009? In 2009, yes. Those were calculated rates for cooperating entities in 2009. What commerce did was looked at the total amount of sales and looked at transaction-specific margins to determine whether or not there were margins above the 216% rate. And it found that there were more than one, at least more than one, transaction-specific margins above the 216% rate. Okay. If there are no other questions, Your Honors, I'll cede my time. Thank you. Okay. Okay. Just one final point, Your Honor. I'm looking at the decision memo from the 2009 review that Commerce pointed to as corroborating the rates that they applied. And this is what it says. In this case, the department found that the 216.01% rate fell within the range of the transaction-specific margins calculated for Hua Feng. Further, we found that the transaction-specific dumping margins relied on for corroboration were not unusually high or otherwise inappropriate. No quantum at all. So if the Federal Register notice says large numbers or significant quantities or whatever it is that it says, it didn't come from the decision memo. And it was the decision memo that they pointed to as corroborating the position that they were taking. Well, assuming there's more than one sale, and that's what I mean by numerous sales or whatever it is, the language you read. And Commerce is looking at whether the 216 rate is corroborated or not. And based on verified sales from volunteer respondents, it determined that it falls within the range of those transactions. Isn't that sufficient corroboration? Or isn't that substantial evidence of sufficient corroboration? I don't believe that it is, Your Honor. Again, I don't see that whether it's one sale or three sales, that the fact that there are sales in a database for a company who gets a margin of 42%, the fact that there are sales in that company's database that are much higher than that, I don't think that's probative of anything. Again, it's not even probative of what that company is doing. I'm baffled how it could be probative. Well, it's probative that sales are being made at that rate. Well, but sales presumably are also being made at a rate of zero based on that same analysis. But you're looking for an AFA rate. You're looking to fill in the sales data of a non-cooperating or non-responding respondent. Right, but that's different than just hunting around for the biggest number that's ever been calculated for anybody, because otherwise that's what they would be allowed to do. Let me ask you this. The government says it was surprised by the fact that you raised this corroboration issue in this fashion on this appeal because you didn't really argue it that way below. Is that true? Well, I think we've always argued that it needed to be corroborated and that the corroboration using this 2009 decision memo was insufficient. The question of the volume, and to be clear, we've always said that this small quantum of sales from this 2009 data wasn't sufficient to corroborate anything. That's been our position throughout. When you say this small quantum of sales, you're saying the small quantum of sales that reflected rates above 216. At or above, right, in the neighborhood. Because they did have a lot of sales. They just only had a few above 260. Right. In focusing on the quantum of those and, to my view, the insignificance of those, I think that's largely a reaction to the ad hoc shrink case because, to me, that was a key difference. And so I'm addressing that, I guess, slightly differently, but the larger point was always that that data wasn't probative even of what that exporter was doing, let alone what the entity was doing. Okay. Anything more? Thank you. Thank you. Excuse me. We would respectfully request an opportunity to just submit a supplemental appendix with the actual information so that there's no factual question about the number of sales. Okay. We'll let you know if we want that, and we'll put out an order requesting it. Thank you. Okay. All right. The case was submitted.